IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR3031 |
| | ) | |
| v. | ) | |
| | ) | |
| AMALIA GRAJEDA, MARIA DE LOS ANJELES MENDEZ, | ) | REPORT, RECOMMENDATION, AND ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

The defendants have moved to suppress physical evidence and statements arising from the traffic stop of the vehicle they occupied while driving on Interstate 80 in Nebraska on February 2, 2005.  See filings 26 and 27.  Nebraska State Patrol Trooper David Frye initiated the traffic stop.  The defendants claim:

- The traffic stop was illegal;

- Trooper Frye stopped the vehicle because the defendants are Hispanic;

- The defendants were unlawfully detained following the stop;

- Trooper Frye unlawfully searched the vehicle when he opened the driver's door to look at the VIN number on the door post; and

- Any consent to search the vehicle was not "sufficiently an act of free-will to purge the primary taint" of the illegal stop and detention.

The defendants moved to suppress "all evidence seized from the motor vehicle, any evidence derived from the search of the motor vehicle and any statements obtained from [the defendants] during the detention and subsequent to [their] arrest, as such evidence and statements were obtained in violation of [their] constitutional rights under the Fourth, Fifth and Fourteenth

Amendments."   Filing 26, attachment 1 (Grajeda brief) at p.5;
filing 28 (Mendez brief) at p.5.

An evidentiary hearing was held on September 23, 2005.[1]   At
the close of the evidentiary hearing, the defendants clarified
that they seek suppression of the statements as fruit of an
illegal stop and detention, and not on the basis of any Fifth
Amendment violation.   Filing 45 (transcript) at p. 135, 137.   I
also found and stated on the record that there was no evidence
supporting defendants' claim of racially based selective
enforcement in violation of the Fourteenth Amendment.   Filing 45
(transcript) at 138.   This report and recommendation therefore
addresses only the Fourth Amendment arguments raised by the
defendants.

The parties have filed their post-hearing briefs, and the
motion is now fully submitted.

---

[1] Videotape evidence was received during the course of this
hearing.   Exhibit 6 is the videotape from Trooper Frye's patrol
vehicle.   A videotape pre-marked as Exhibit 7 and delivered to my
chambers by the government was destroyed by the VCR when I
attempted to review it prior to the hearing.   Based on the
government's representation at the hearing, Exhibit 7 contained a
copy of the video recording from Trooper Bigsby's patrol vehicle
followed by a copy of the video recording from the scale at mile
marker 416.   The parties agreed to permit the court to receive a
new copy of Exhibit 7 after the close of the hearing.   The
content of Exhibit 7 was delivered to the court by the government
in the form of two videotapes rather than one.   Pursuant to the
agreement of the parties, these videotapes replace Exhibit 7 in
the evidentiary record.   They are marked and received as Exhibit
7A, the videotape from Trooper Bigsby's patrol vehicle; and
Exhibit 7B, the videotape of the events occurring at the mile
marker 416 scale.

2

FACTUAL FINDINGS

On February 2, 2005, at approximately 2:20 p.m., the defendants were traveling eastbound on Interstate 80 near Lincoln, Nebraska.  Defendant Mendez was driving a white BMW SUV owned by defendant Grajeda, who was a front seat passenger at the time of the traffic stop.

Trooper Frye was traveling west on the interstate at approximately mile marker 409 when he noticed the defendants' approaching vehicle and noted that it had no front license plate. As the defendants' vehicle passed, Trooper Frye looked in his rear-view mirror to see which state had licensed the vehicle so he could determine whether a front plate was required under that state's law.  Although the BMW had a rear license plate, Trooper Frye could not determine which state had issued that plate.  He therefore entered the median and U-turned to follow the eastbound BMW.

While approaching the vehicle from behind in the passing lane, Trooper Frye observed the BMW drive onto the white line of the right shoulder.  He also saw beads hanging from the rear-view mirror, and although the view of the rear license plate was partially obstructed by a plate bracket, he could see the partially covered word "Nevada" on the plate.  Trooper Frye had previously stopped a Nevada vehicle that day and knew Nevada law required both a front and rear license plate.  Near mile marker 411, (see ex. 1 (warning ticket)), Trooper Frye activated his lights to conduct a traffic stop.  The traffic stop was initiated because the vehicle had no front license plate, the rear plate was partially obstructed in violation of Nebraska's visible license plate law, items were hanging from the rear view mirror

3

in violation of Nebraska law, and the vehicle was driven on the shoulder line of the road.  Prior to stopping the vehicle, Trooper Frye did not see or notice the race of the driver or passenger.

The traffic stop was initiated at approximately 2:22 p.m. The defendants immediately pulled over.  Trooper Frye exited his vehicle and went to the passenger side window of the stopped vehicle to speak with the defendants.  When the passenger side window rolled down, Trooper Frye noticed an overwhelming odor of air freshener emanating from the vehicle.  He advised the defendants of the reasons for the stop, and when he mentioned driving on the shoulder, Mendez (speaking through Grajeda as an interpreter) acknowledged driving onto the shoulder to move out of the officer's way.  In response to his requests, Trooper Frye received both defendants' driver's licenses, the vehicle registration, and insurance documentation for the vehicle. Mendez was asked to step out of the vehicle and be seated in the passenger side front seat of the patrol car, and she complied with this request.

Defendant Grajeda remained seated in the front passenger seat of the stopped vehicle.  Shortly after Trooper Frye returned to his patrol vehicle with Mendez, Grajeda leaned out the passenger window, and with nearly half her body extended out the window, stared back at the trooper and Mendez.  Grajeda was "moving all over the place" within the stopped vehicle while Trooper Frye spoke with Mendez in the patrol car.  Trooper Frye considered Grajeda's movements unusual and disconcerting.  He therefore contacted Trooper Chris Bigsby for backup assistance.

Trooper Bigsby arrived at the scene of the traffic stop at approximately 2:32 p.m.[2]

   While seated in the patrol vehicle with Mendez, Trooper Frye asked Mendez questions concerning the origin, purpose, and destination of defendants' trip.  Mendez speaks primarily Spanish and Trooper Frye speaks limited Spanish, making communications difficult at times.  However, Trooper Frye understood Mendez as stating Grajeda was her niece, the defendants had left Las Vegas the previous day at approximately 4:00 p.m., they had driven non-stop, and they were traveling to meet Grajeda's boyfriend who lived in Iowa.  Mendez stated she would be returning home the following Monday.  She did not know the name of the city where Grajeda's boyfriend lived or the defendants' specific destination

---

[2]Trooper Bigsby's vehicle was parked behind Trooper Frye's at the scene of the traffic stop.  Trooper Frye's in-car camera was activated automatically with his overhead lights, and he manually activated his body microphone.  As Trooper Bigsby arrived, he activated his in-car camera and adjusted his scanner to the frequency of Trooper Frye's body microphone.  By doing so, Trooper Bigsby could remain in his patrol car and hear the conversation occurring in Trooper Frye's vehicle over his scanner.  Trooper Frye's communications with Mendez are therefore recorded on the videotapes derived from the in-car cameras in both Trooper Frye's and Trooper Bigsby's vehicle.  The digital time recorded on those videotapes are not, however, identical. Trooper Bigsby's in-car camera videotape records that the events occurred approximately four minutes and thirty seconds later than the digital time references recorded on Trooper Frye's videotape. Compare e.g. Ex. 7A (Bigsby videotape) at 14:37 to Ex. 6 (Frye videotape) at 14:32:30.  Although the time references on the Frye videotape are likely incorrect, (Trooper Frye announces that the time is 3:46 p.m. at 15:41 on exhibit 6 (Frye videotape)), since Trooper Frye's videotape records the events beginning with initiating the traffic stop, the vast majority of references to videotaped evidence in this report and recommendation are to Trooper Frye's videotape, exhibit 6, supplemented as needed by Trooper Bigsby's videotape, exhibit 7A.  Therefore, the time references in the factual findings herein are based on those reflected in Trooper Frye's videotape.

in Iowa.[3]  Trooper Frye contacted dispatch to determine if
Mendez' driver's license was valid, and to request criminal
history information regarding both defendants.

At approximately 2:34 p.m. Trooper Frye exited his vehicle
to return Grajeda's driver's license and check the vehicle's VIN
number.  After handing Grajeda her license, Trooper Frye asked
Grajeda questions concerning the arrangements and purpose of the
defendants' trip.  Grajeda speaks both Spanish and English, and
no language barrier existed in communicating with Grajeda.
Grajeda stated she was traveling with her aunt, Mendez, from Las
Vegas to an unknown city in Iowa to meet the family of Grajeda's
boyfriend.  Grajeda stated her boyfriend lives in Las Vegas, was
still in Las Vegas, and was flying to Iowa the following Saturday
to join her at his family's home.  Grajeda stated she intended to
remain in Iowa for three weeks, and Mendez was along for the
ride.  Trooper Frye asked Grajeda how the defendants were going
to find her boyfriend's family when they did not know the
family's address.  Grajeda stated the defendants intended to call
when they reached Iowa to get specific information.

Trooper Frye advised Grajeda that he was going to check the
Vehicle Identification Number (VIN) of the BMW located on the
dashboard and the door panel.  He proceeded to the front driver's
side of the vehicle and looked through the front windshield to
read the VIN posted on the lower edge of the driver's side dash.
At approximately 2:37 p.m., he opened the driver's door to read
the VIN on the door post.  From his crouched position at the open

---

[3]As verified later during this traffic stop through the
assistance of an interpreter, Trooper Frye was able to correctly
understand Mendez' description of the trip despite the language
barrier.

driver's door, Trooper Frye noticed the bolts securing the driver's seat were "scarred," as if a ratchet had recently been used to remove and reinstall the seat. Based on his training and experience, Trooper Frye knew that, for sound deadening purposes, this make and model of vehicle was designed to have an open and empty compartment under the front seat. He also knew that such compartments are used to hide and transport illegal drugs, and can be accessed by removing the front seat, pulling up the carpet, and cutting into the floorboard. See exs. 2 & 5 (photographs).

Trooper Frye returned to his patrol vehicle and completed the paperwork for the traffic stop. He handed Mendez her driver's license, the vehicle information still in his possession, and a warning ticket at 2:39 p.m. However, Trooper Frye was concerned that due to the language barrier, Mendez may not understand that she had received only a warning and was not required to appear in court or pay a fine. Trooper Frye therefore contacted NSP Trooper Coover, an officer in Omaha, to provide a telephonic interpretation of the warning ticket by speaker phone. Using Trooper Coover as a Spanish interpreter, Trooper Frye explained why he conducted the traffic stop, that the traffic stop was completed, Mendez had received a warning, and she needed to sign the warning but did not have to pay a fine. Ex. 6 (Frye videotape) at 14:41--14:44.

Through the interpreter, Trooper Frye told Mendez that the traffic stop was completed, and asked Mendez if he could ask her additional questions. Mendez agreed to further questioning. Using the interpreter to dispel any language barrier, Trooper Frye re-asked questions concerning the purpose, origin, and destination of the defendants' trip. Mendez confirmed her

7

previous statements, and further stated that she and Grajeda were returning from Iowa together; that she is a housekeeper and was on vacation for two weeks; that Grajeda is a dancer; and that Mendez stated she went on the trip to help take care of Grajeda's baby. Grajeda was pregnant, and the baby was not due within the week, but Mendez also stated she was returning to Las Vegas the following Monday. Ex. 6 (Frye videotape) at 14:41--14:52.

Trooper Frye, on his own and through the interpreter, asked if there was heroin, marijuana, cocaine, a large amount of money, or a gun in the vehicle. Mendez stated she had three hundred dollars in the vehicle, but denied possessing illegal drugs or a gun. Ex. 6 (Frye videotape) at 14:50--14:54. Trooper Bigsby, who had been monitoring these communications between Trooper Frye and Mendez, began making initial attempts to locate a canine and advise a supervisor that assistance may be needed. Ex. 7A (Bigsby videotape) at 14:55-59.

Through the interpreter, Trooper Frye asked Mendez for consent to search the vehicle. Ex. 6 (Frye videotape) at 14:54-59. Mendez consented to the search, but also stated she did not own the vehicle. She was specifically asked if she would consent to the search of the items she owned in the vehicle. Mendez consented to this search. Trooper Frye provided Mendez with a Nebraska Consent to Search form, written in Spanish, and asked her to read it aloud. She did so and signed the form (see Ex. 1 (Consent to Search)), but through the interpreter, again reminded Trooper Frye that she did not own the vehicle. Trooper Frye thanked Mendez for her cooperation. Mendez was advised in Spanish that if she needed anything during the search of the vehicle, she should honk the horn on Trooper Frye's patrol vehicle to get his attention.

Trooper Frye approached Grajeda, who was still seated in the BMW.  Grajeda was pregnant and told Trooper Frye that she had to use the bathroom.  Trooper Frye responded that he was going as fast as he could and re-asked some questions regarding the defendants' trip plans.  He asked Grajeda if there was a large amount of money, drugs or weapons in the vehicle.  Grajeda stated the defendants had three hundred dollars, but they had no weapons or drugs.  Trooper Frye asked, "Can I search the car to make sure there's nothing illegal in here?"  Grajeda verbally consented to the search.  Trooper Frye provided Grajeda with the written consent form, which had already been signed by Mendez, and after confirming Grajeda could read Spanish, asked her to read it aloud.  After Grajeda read the form aloud, Trooper Frye asked if she understood the form, confirmed that she understood she "had the right to say 'no,'" and asked her to sign the form if she was willing to let the officers search the vehicle.  Grajeda signed the form.  See ex. 1; ex. 6 (Frye videotape) at 15:00-05.

Grajeda was then seated with Mendez in Trooper Frye's patrol vehicle.  Trooper Frye reminded both defendants that if they needed anything during the stop, they should honk the horn on the patrol vehicle.

The vehicle search began immediately thereafter.  Eight minutes later, Trooper Frye approached Grajeda and asked her to permit the vehicle to be moved five miles to the scale for continuation of the search.  He explained the scale would be a better location since Grajeda had stated she needed a restroom and the scale had restrooms, and also because it was a safer location for the officers.  Grajeda responded, "I can wait 'til I get to the bathroom.  I mean I don't have to go that bad." Ex. 6 (Frye videotape) at 15:14:53-15:14:58.  After Trooper Frye

9

reiterated the risk to officers in searching the vehicle on the highway, Grajeda agreed to drive the vehicle to the scale.  Ex. 6 (Frye videotape) at 15:07-15.

Troopers Frye and Bigsby promptly placed the defendants' luggage into the BMW and closed its doors.  Trooper Frye returned to his patrol vehicle and asked Grajeda if Mendez could drive the BMW to the scale while Grajeda rode with Trooper Frye in his patrol vehicle.  Trooper Frye stated that he wanted Grajeda to be his passenger so he could learn Spanish from Grajeda en route to the scale; his actual intent was to separate the defendants while the vehicle was moved to the scale to make sure they did not drive off.  Grajeda hesitated but agreed to ride with Trooper Frye.  Ex. 6 (Frye videotape) at 15:16-20.  Trooper Bigsby drove to the scale located at mile marker 416 on Interstate 80, followed by Mendez driving the BMW, and then Trooper Frye and Grajeda in Frye's patrol vehicle.

At the scale Trooper Frye again asked Grajeda for consent to continue the vehicle search.  Using Grajeda as an interpreter, he also asked Mendez for consent to search her property.  Both agreed to the search.  Ex. 6 (Frye videotape) at 15:24-26.

Trooper Dugger, a carrier enforcement and canine officer for the Nebraska State Patrol, was stationed and working at the scale at mile marker 416 when the defendants' vehicle arrived.  While the defendants used the restroom at the scale, a canine search was conducted.  The dog alerted to the presence of illegal drugs in the BMW.  Ex. 6 (Frye videotape) at 15:29.

The search of the BMW continued, and cocaine was found in the vehicle at approximately 3:45 p.m.  Ex. 6 (Frye videotape) at

15:41.  Grajeda and Mendez were arrested for possession of
cocaine.  Ex. 7B (scale videotape).

     From the time the search began on the roadside until it
ended at the scale, neither Grajeda nor Mendez stated or
indicated in any way that the officers should stop searching the
vehicle.  Trooper Frye ensured that despite any language
barriers, the defendants understood the nature and purpose of the
traffic stop, the warning ticket and its consequences, and his
request for consent to search.  Even after Grajeda read the
written consent form, Trooper Frye verbally advised Grajeda, the
owner of the BMW, that she had the right to refuse consent.
Before requesting to search the vehicle he used an interpreter to
verify that an actual divergence existed between the defendants'
explanations of their trip and that his perception of differing
stories was not due to his inability to clearly communicate with
Mendez.  Once he confirmed that the defendants' stories were
different, he requested consent to search the vehicle.  As to all
three occasions when consent was given, Trooper Frye never
demanded consent to search the vehicle.  His tone throughout the
entire traffic stop, search, and arrest of the defendants was
both cordial and professional.

                         LEGAL ANALYSIS

     The defendants claim Trooper Frye violated the Fourth
Amendment by conducting an unlawful traffic stop.  Initiating a
traffic stop is lawful "where the police have probable cause to
believe that a traffic violation has occurred."  Whren v. United
States, 517 U.S. 806, 810 (1996).  Any traffic violation, no
matter how minor, provides a police officer with probable cause
to stop the vehicle.  United States v. Fuse, 391 F.3d 924, 927

                              11

(8th Cir. 2004); <u>United States v. Herrera-Martinez</u>, 354 F.3d 932, 934 (8th Cir. 2004); <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002); <u>United States v. Alcantar</u>, 271 F.3d 731, 736 (8th Cir. 2001). "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." <u>United States v. Jones</u>, 275 F.3d 673, 680 (8th Cir. 2001). Although a traffic stop cannot be pretextual, "so long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." <u>Alcantar</u>, 271 F.3d at 736. See also <u>Whren</u>, 517 U.S. at 812; <u>United States v. Bell</u>, 86 F.3d 820, 822 (8th Cir. 1996). Police officers must be able to point to specific and articulable facts warranting the traffic stop. <u>Fuse</u>, 391 F.3d at 927.

On February 2, 2005, when the defendants' vehicle was stopped, Nevada law provided:

> The license plates for a motor vehicle other than a motorcycle, power cycle or motor vehicle being transported by a licensed vehicle transporter must be attached thereto, one in the front and the other in the rear.

Nev. Rev. Stat. § 482.275.[4]  The defendants' vehicle did not have a front license plate, and it was therefore not properly displaying license plates in accordance with Nevada law. This

---

[4]Effective June 6, 2005, Nevada law does not require a front license plate "[i]f the motor vehicle was not manufactured to include a bracket, device or other contrivance to display and secure a front license plate, and if the manufacturer of the motor vehicle provided no other means or method by which a front license plate may be displayed upon and secured to the motor vehicle." 2005 Nevada Laws Ch. 279 (S.B. 251). This statutory change post-dates the traffic stop at issue in this case and is therefore irrelevant with respect to this motion to suppress.

violation of Nevada law justified stopping the defendants'
vehicle.  United States v. Smart, 393 F.3d 767 (8th Cir. 2005)
(officer who noticed a vehicle with only a rear license plate,
but who was unable to discern which state had issued plate, had
reasonable suspicion justifying a traffic stop, even though he
later determined that the vehicle was licensed in Georgia, which
does not require a front plate).

     Trooper Frye also had probable cause to stop the defendant
for violations of Nebraska law.  Nebraska law provides:

          All letters, numbers, printing, writing, and other
          identification marks upon [license] plates . . . shall
          be kept clear and distinct and free from grease, dust,
          or other blurring matter, so that they shall be plainly
          visible at all times during daylight and under
          artificial light in the nighttime.

Neb. Rev. Stat. §60-324.  Violating this statute is a "clear
visible plate" violation, and a Class III misdemeanor.  Neb. Rev.
Stat. §60-348.  The plate cover on defendants' vehicle
obstructed, in part, the word "Nevada" on the license plate and
as such, the defendants' vehicle was improperly displaying plates
under Nebraska law.

     Beads were hanging from the rear view mirror in the
defendants' vehicle in violation of Neb. Rev. Stat. § 60-6,256
which states:

          It shall be unlawful for any person to operate a motor
          vehicle with any object placed or hung in or upon such
          vehicle, except required or permitted equipment of the
          vehicle, in such a manner as to obstruct or interfere
          with the view of the operator through the windshield or
          to prevent the operator from having a clear and full
          view of the road and condition of traffic behind such
          vehicle.

13

Neb. Rev. Stat. § 60-6,256.

Finally, Trooper Frye observed the defendants' vehicle drive
onto the shoulder fog line.  Nebraska law states that "[n]o
person shall drive on the shoulders of highways," except under
certain circumstances which do not apply here.  Neb. Rev. Stat. §
60-6,142.  Weaving onto the shoulder of the interstate
constitutes a violation of section 60-6,142 and, considered in
conjunction with previous described violations, established
probable cause to stop the defendants' vehicle.  United States v.
Mallari, 334 F.3d 765, 767 (8th Cir. 2003)(officer had an
objectively reasonable basis for stopping the defendant's vehicle
for Nebraska traffic law violations where the license plate was
unlit and the vehicle was weaving over the shoulder line of
interstate).  I conclude Trooper Frye had probable cause to stop
the defendants' vehicle.

The defendants claim, however, that they were unlawfully
detained following the stop.  "It is well settled that while an
officer may possess reasonable suspicion to make an investigative
stop, the length and scope of that stop may not exceed reasonable
bounds."  United States v. Foley, 206 F.3d 802, 805 (8th Cir.
2000).

After stopping a vehicle, the trooper may lawfully ask any
questions reasonably related to the stop, which typically include
asking for the driver's license and registration, requesting the
driver to sit in the patrol car, and asking the driver about the
origin, destination, and purpose of his trip.  United States. v.
Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing United States
v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v.

14

Richards, 967 F.2d 1189, 1192-93 (8th Cir. 1992)).  An officer
may detain vehicle occupants while he performs the somewhat time-
consuming but routine tasks of writing a citation, and completing
computerized checks of a driver's license, vehicle registration,
and criminal histories of the vehicle occupants.  Fuse, 391 F.3d
at 927; United States v. White, 81 F.3d 775 (8th Cir. 1996).
Moreover, an officer does not violate the Fourth Amendment by
speaking with the driver and passenger, and asking both of them
questions about their trip plans.  See e.g. Allergee, 175 F.3d at
650 (no Fourth Amendment violation where the sheriff separately
questioned the driver and passenger and developed reasonable
suspicion of criminal activity based on the divergence in their
answers).

        The defendants may be claiming their detention was
unreasonably long under the circumstances, and that Trooper Frye
should have ceased any investigation once he was told by Grajeda
that she needed to use the bathroom.  This statement was first
made when Trooper Frye returned to the BMW to hand Grajeda her
driver's license, ask her questions about the defendants' planned
trip, and check the BMW's VIN number.  Whatever merit this
argument may have under some circumstances, it lacks any factual
basis in this case.  More than thirty minutes later, when Trooper
Frye asked Grajeda for consent to move the BMW to the scales for
officer safety and to give her access to a restroom, Grajeda
responded, "I can wait 'til I get to the bathroom.  I mean I
don't have to go that bad."  Ex. 6 (Frye videotape) at
15:14:53-15:14:58.  Grajeda had no urgent need to use the
restroom, and detaining her to complete the trooper's
investigation of this stop did not violate her Fourth Amendment
rights.

Within fifteen minutes of initiating the traffic stop, and
before he ever opened the BMW door to check the VIN number,
Trooper Frye had noted the strong smell of air freshener in the
vehicle, which is often used during drug transport to mask the
odor of illegal drugs; the unusual and persistent movements of
Grajeda as she waited in the stopped vehicle, including her act
of briefly positioning the upper half of her body out the
passenger window to observe Mendez and Trooper Frye in his patrol
vehicle; the discrepancies in the stories relayed by Grajeda and
Mendez, specifically to include how long the trip was scheduled
to last, where Grajeda's boyfriend lived, where he was currently
located, how he was planning to arrive in Iowa, and whose home
they were planning to visit; and the fact that neither defendant
knew even the name of the destination city, much less the
specific address of their destination in Iowa.  Although each of
these factors alone "is susceptible of innocent explanation, and
some factors are more probative than others," a "determination
that reasonable suspicion exists . . . need not rule out the
possibility of innocent conduct."  United States v. Arvizu, 534
U.S. 266, 277 (2002).

Conflicting stories provided by the passenger and driver may
raise reasonable suspicion and justify further detention of the
vehicle occupants.  United States v. Gaxiola, 2005 WL 2446069, *1
(8th Cir. October 5, 2005); Jones, 269 F.3d at 926-27; United
States v. Morgan, 270 F.3d 625, 631-32 (8th Cir. 2001); United
States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001) (inconsis-
tencies in information regarding the trip and the relationship
between the driver and passenger justified further detention of
the driver while the officer continued to investigate).
Reasonable suspicion permits a trooper to expand the scope of the
stop and ask additional, more intrusive, questions not directly

16

related to the initial traffic stop.  "[T]he line that separates
a traffic stop from an investigative stop is generally difficult
to draw and artificial."  United States v. Long, 320 F.3d 795,
801 (8th Cir. 2003).  "[A]n investigative stop can grow out of a
traffic stop so long as the officer has reasonable suspicion to
expand his investigation, even if his suspicions are unrelated to
the traffic offense that served as the basis for the stop."
Long, 320 F.3d at 800.

In this case Trooper Frye expanded the defendants' detention
when he contacted an interpreter to assist him in explaining the
warning ticket and confirming his understanding of Mendez'
description of the trip.  He asked further questions concerning
whether the defendants intended to return to Las Vegas together,
where each of them worked, and what Mendez intended to do on the
trip.  The responses to these questions raised additional
suspicions and further prompted Trooper Frye to request consent
to search the vehicle.

Though the traffic stop was completed, Trooper Frye did not
unlawfully detain the defendants by seeking their cooperation in
answering additional questions or granting permission to search
their vehicle.  "Law enforcement officers do not violate the
Fourth Amendment by asking a person for consent to search or
other types of cooperation, even when they have no reason to
suspect that person, 'provided they do not induce cooperation by
coercive means.'"  United States v. Yang, 345 F.3d 650, 654 (8th
Cir. 2003)(quoting United States v. Drayton, 536 U.S. 194, 201
(2002)).  "[T]he time it takes for an officer to find out if
consent will be given cannot be an unlawful detention in the
absence of coercive or otherwise unusual circumstances."

17

There is no evidence to support a claim that Trooper Frye coerced either defendant to cooperate once the traffic stop was over.  The defendants consented to a vehicle search, this encounter was voluntary, and it was not an unlawful detention. Yang, 345 F.3d at 654 (where the defendant consented to a search upon completion of the traffic stop and after being told he was free to leave, the additional time related to requesting and conducting the vehicle search was not an unlawful detention).

The traffic stop of defendants' vehicle developed into an investigatory stop.  Upon reviewing the evidence, including the videotapes, I conclude Trooper Frye expeditiously and reasonably carried out his duties related to both the traffic stop and his ensuing investigation to determine if other criminal activity was afoot.  The defendants were not unlawfully detained in violation of the Fourth Amendment.

Citing New York v. Class, 475 U.S. 106, 119 (1986), the defendants claim that since the VIN of their vehicle was visible through the windshield, opening the BMW's driver's side door to view the VIN was unjustified and violated their Fourth Amendment rights.  They claim this Fourth Amendment violation justifies suppression of all evidence arising from the traffic stop.

In Class, a motorist was stopped by two officers for a traffic violation.  When he exited his vehicle and approached one of the officers, the other officer opened the car door to look for the VIN which was located on the vehicle's left door jamb. The officer did not find the VIN on the door jamb so he reached into the car's interior to move some papers that were obscuring the area where the dashboard VIN was located.  As he did so, he saw the handle of a gun protruding from underneath the driver's

18

seat and seized the gun.   The defendant was arrested, and he
moved to suppress the discovery of his gun in the vehicle,
claiming the officer's entry into his vehicle to secure the VIN
violated his Fourth Amendment rights.   In denying the defendant's
motion, <u>Class</u> held:

> The search was focused in its objective and no more
> intrusive than necessary to fulfill that objective.
> The search was far less intrusive than a formal arrest,
> which would have been permissible for a traffic offense
> . . . , and little more intrusive than a demand that
> respondent--under the eyes of the officers--move the
> papers himself.   The VIN, which was the clear initial
> objective of the officer, is by law present in one of
> two locations--either inside the doorjamb, or atop the
> dashboard and thus ordinarily in plain view of someone
> outside the automobile.   Neither of those locations is
> subject to a reasonable expectation of privacy.   The
> officer here checked both those locations, and only
> those two locations.   The officer did not root about
> the interior of respondent's automobile before
> proceeding to examine the VIN.   He did not reach into
> any compartments or open any containers.   He did not
> even intrude into the interior at all until after he
> had checked the doorjamb for the VIN.   When he did
> intrude, the officer simply reached directly for the
> unprotected space where the VIN was located to move the
> offending papers.   We hold that this search was
> sufficiently unintrusive to be constitutionally
> permissible in light of the lack of a reasonable
> expectation of privacy in the VIN and the fact that the
> officers observed respondent commit two traffic
> violations.   Any other conclusion would expose police
> officers to potentially grave risks without
> significantly reducing the intrusiveness of the
> ultimate conduct--viewing the VIN--which, as we have
> said, the officers were entitled to do as part of an
> undoubtedly justified traffic stop.

<u>Class</u>, 475 U.S. at 118-119.   However, the Court went on to  state
that officers are not authorized "to enter a vehicle to obtain a
dashboard-mounted VIN when the VIN is visible from outside the
automobile.   If the VIN is in the plain view of someone outside

the vehicle, there is no justification for governmental intrusion
into the passenger compartment to see it." <u>Class</u>, 475 U.S. at
119.

<u>Class</u> stated that a motorist has no reasonable expectation
of privacy in the VIN posted on a vehicle doorjamb, while also
stating that officers cannot intrude into the vehicle's passenger
compartment to view a VIN if the number is visible from the
outside.  This language has at least two plausible
interpretations, and these interpretations lead to entirely
different outcomes under the Fourth Amendment.

As the government urges, the <u>Class</u> Court may not have
considered opening a car door and crouching down to look at the
doorjamb to be a "governmental intrusion into the passenger
compartment."  In support of this position, the government notes
that under the facts in <u>Class</u>, the officer had opened the vehicle
door to view the doorjamb, yet the Court noted the officer "did
not even intrude into the interior at all until after he had
checked the doorjamb for the VIN."  <u>Class</u>, 475 U.S. at 118-119.

In contrast, the defendant relies on the Tenth Circuit's
interpretation of <u>Class</u>.  <u>United States v. Caro</u>, 248 F.3d 1240,
1246 (10th Cir. 2001), held that where the dashboard VIN plate is
readable through the windshield, the dashboard VIN matches the
VIN listed on the vehicle registration, and there is no
indication the dashboard plate has been tampered with, an officer
cannot open the car door and check the VIN on the doorjamb.

Neither the Eighth Circuit nor the Nebraska Supreme Court or
Court of Appeals have specifically addressed the issue of whether
an officer may open a vehicle door to view the VIN when the VIN

20

is already visible through the windshield.  The Tenth Circuit's
interpretation of <u>Class</u> is persuasive, but it is not a clearly
stated principle of binding Fourth Amendment jurisprudence in
this forum; and <u>Class</u>, which is binding on this forum, leaves the
issue open to interpretation as applied to the facts of this
case.

I need not and do not decide whether Trooper Frye's act of
opening the car door to read the VIN on the BMW door post
violated the Fourth Amendment.  I conclude that even assuming
this act violated the defendants' rights, under the circumstances
of this case the defendants' consents to the vehicle search
purged the taint of Trooper Frye's alleged Fourth Amendment
violation.  As explained below, the causal chain between the
Fourth Amendment violation and evidence discovered thereafter
during the search was broken by sufficient acts of free will in
consenting to the search by law enforcement.  <u>Ramos</u>, 42 F.3d at
1164.

Determining whether a consent to search purges the taint of
a prior Fourth Amendment violation requires a two-part inquiry.
The court must decide:  1) if the defendant voluntarily consented
to the search, and 2) whether this consent was given under
circumstances that render it an independent, lawful cause of
discovering the incriminating evidence.  <u>United States v. Becker</u>,
333 F.3d 858, 861 (8th Cir. 2003).

The Eighth Circuit has clearly and recently summarized the
analysis required in determining if a defendant voluntarily
consented to a search.

> A court determines whether consent is voluntary under
> the totality of the circumstances.  The Government

21

bears the burden of proving voluntary consent by a
preponderance of the evidence and must show that the
defendant behaved in such a manner that the officer
reasonably believed that the search was consensual.  In
evaluating the reasonableness of the officer's belief,
we consider the characteristics of the person
consenting, including the party's age, intelligence and
education, whether he was under the influence of drugs
or alcohol, whether he was informed of his right to
withhold consent, and whether he was aware of rights
afforded criminal suspects.  We also consider the
environment in which the alleged consent took place,
specifically (1) the length of time he was detained;
(2) whether the police threatened, physically
intimidated, or punished him; (3) whether the police
made promises or misrepresentations; (4) whether he was
in custody or under arrest when the consent was given;
(5) whether the consent occurred in a public or a
secluded place; and (6) whether he stood by silently as
the search occurred.

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir.
2005)(internal citations omitted).  See also United States v.
Mancias, 350 F.3d 800, 805 (8th Cir. 2003).

Both Grajeda and Mendez are adults whose primary language is
Spanish.  Both are literate in the Spanish language; Grajeda can
also read and speak English.

Trooper Frye's initial request for consent to search was
directed to Mendez and conveyed through a Spanish interpreter.
This request was made twenty minutes after Frye had opened the
BMW door to read the VIN.  Mendez clearly understood the request,
as evidenced by the fact that she advised Trooper Frye that
although she consented to a vehicle search, she did not own the
BMW.  She then verbally consented to a search of her property
within that vehicle.  Following the verbal consent, she read the
Spanish version of the NSP Permission to Search form aloud, and
signed the form.

Trooper Frye then spoke with Grajeda and asked for her consent to search the vehicle.  She also verbally agreed to the search.  As with Mendez, Grajeda was asked to read the Spanish version of the NSP Advice of Rights form aloud.  She complied with this request and after Trooper Frye confirmed that she understood the form, including her right to withhold consent, Grajeda signed the consent form.

Thirty minutes after Trooper Frye had opened the BMW door to read the VIN, and after he had begun to search the vehicle, he secured an additional consent from Grajeda when he asked if she would permit the vehicle to be moved to the scale to continue the search.  Grajeda agreed to this request and rode with the officer while Mendez drove the vehicle to the scale.

Forty minutes after Trooper Frye had opened the BMW door to read the VIN, and before beginning the vehicle search at the scale, Trooper Frye again requested consent to continue searching the vehicle from Grajeda directly, and from Mendez, with Grajeda acting as an interpreter.  Both defendants again consented to the search.

Based on the videotape evidence, neither defendant appeared to be under the influence of drugs or alcohol throughout their entire encounter with Trooper Frye on February 2, 2005.  At all times, Trooper Frye was courteous, professional, and responsive to the defendants' questions and comments.  He did not demand any consent to search.  He did not threaten, physically intimidate, or punish either defendant, and he made no promises or misrepresentations to secure their consents.  The defendants were not under arrest or in custody, nor were they in a secluded place or alone with officers on a dark highway when Trooper Frye

23

requested their consents.  The events of February 2, 2005
occurred during the daylight hours of a winter afternoon along
Interstate 80 near Lincoln, Nebraska.  Though Trooper Frye had
specifically advised both defendants that they could honk the
patrol vehicle horn if they needed anything during the search,
neither did so.  Grajeda did stop officers to ask questions
during the course of the roadside vehicle search, and Grajeda and
Mendez were seated together during the search on the roadside and
at the scale, but neither defendant ever asked any officer to
stop searching the vehicle, or indicated in any way that her
consent to search was withdrawn.

   Under these facts I conclude Mendez and Grajeda consented to
a search of their vehicle.  Both consented to the search in
writing.  Mendez verbally consented at least twice; Grajeda
verbally consented on three occasions.  Grajeda was specifically
reminded, before signing the consent to search form, that she had
the right to refuse consent.  Under the totality of these
circumstances, a reasonable officer would have concluded the
defendants' consents were freely and voluntarily given.  United
States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002)(defendant's
consent was sufficient to purge the taint of an illegal stop
where he consented to a vehicle search when first approached,
first by giving oral consent, then written consent; orally
consented a second time to a continued search after being advised
that he could refuse consent; and although provided the
opportunity to object to the continued search at any time,
registered no objection even after his vehicle was towed).

   A "voluntary consent to a search, preceded by an illegal
police action, does not automatically purge the taint of an
illegal detention."  Becker, 333 F.3d at 862.  Rather, to

24

determine if the taint is purged, the court must consider: (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. <u>Becker</u>, 333 F.3d at 862.

Time elapsed between Trooper Frye's act of opening the BMW door and the defendants' consents:  as to the first consents, twenty minutes; as to the second consent from Grajeda, thirty minutes; as to the third consent from both defendants, forty minutes.  Before any search began, Trooper Frye ensured that each defendant read the consent form and he specifically reminded Grajeda of her right to refuse consent.  "Such a warning is not required by law, . . . and so the fact that the officer gave it indicates rather strongly . . . that he was not attempting to exploit an illegal situation."  <u>United States v. Thomas</u>, 83 F.3d 259, 260 (8th Cir. 1996)(citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).

"Turning to the most critical factor--the nature of [Trooper Frye's alleged] Fourth Amendment violation," I note that whether this act actually violates the Fourth Amendment remains an unanswered question in this circuit.  <u>United States v. McGill</u>, 125 F.3d 642, 644 (8th Cir. 1997).[5]   Assuming a violation

---

[5]There is reason, though, to follow the Tenth Circuit's lead in this case.  The trooper had already checked the vehicle's VIN on the dash, and there was no evidence that it conflicted in any way with the vehicle's registration.  In addition, the trooper's action in inspecting the inside VIN was not, in this court's experience, a customary practice.  This court has watched videotapes of literally hundreds of vehicle stops on I-80 by Nebraska State Patrol troopers, and extremely few, if any, of them involved cross-checking the two VINs of the stopped vehicle. Finally, in the videotapes there is no previous or subsequent mention of the VIN numbers nor of any suspicion of theft of the

occurred, it was not flagrant.  Class held that, at least in the circumstances of that case, looking at a vehicle doorjamb to inspect the VIN "was far less intrusive than a formal arrest",; since the doorjamb is often in plain view of someone outside the automobile, the officer did not "root about the interior of respondent's automobile before proceeding to examine the VIN,". . . "did not reach into any compartments or open any containers,". . . [and] did not even intrude into the interior at all until after he had checked the doorjamb for the VIN." Class, 475 U.S. at 118.  Such a search is "sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations." Class, 475 U.S. at 118-119.

I conclude that the defendants' acts of signing the consent form, and their additional verbal consents to the vehicle search were given under circumstances that render then an independent and lawful cause for discovering the incriminating evidence in

---

vehicle, improper registration, or other crimes to which the VIN might be relevant.  These facts are a significant part of the totality of the circumstances here, because this trooper testified that he knew from prior experience that this very model of vehicle has an empty compartment capable of hiding contraband, and that it could be accessed through the floorboard by removing the base fasteners of the front seat -- fortuitously located near the area where he was going to check the VIN.  While it is true that he did not rifle around the contents or open any containers---other than the car itself--it is also true that there is no reason in the evidence to conclude that his act of double checking the VIN was anything other than a pretext or *post hoc* rationalization for an investigative search for scratches on the bolts holding down the front seat.  Without an articulable need to see the VIN on the door post, it is questionable whether a reasonable officer would be considered authorized in examining it--and its immediate surroundings--without violating the occupant's Fourth Amendment rights.

the BMW, and any evidence, including statements, arising from
that discovery.  The defendants' consents were intervening acts
of free will sufficient to purge the taint of any alleged
unlawful search of the defendants' VIN.  McGill, 125 F.3d at 644
(where the VIN was visible through the windshield, yet the
officer put his head through the driver's open side window and
upon smelling marijuana, immediately requested and obtained
consent to search under circumstances where the defendant
understood his right to withhold such consent, the taint of any
alleged Fourth Amendment violation was purged by the defendant's
consent).  See also United States v. Beason, 220 F.3d 964, 967
(8th Cir. 2000)(even assuming the officers lacked reasonable
suspicion to stop the truck and that the subsequent detention was
unreasonable, where a written consent form was signed after the
officer instructed the defendant to read the form and ensured he
understood it, in the absence of any evidence of coercion, the
defendant's consent to search the truck was "sufficiently an act
of free will to purge the primary taint").

    In accordance with the above,

    IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard
G. Kopf, United States District Judge, pursuant to 28 U.S.C.
§636(b)(1)(B), that the defendants' motions to suppress, filings
26 and 27, be denied in all respects.

    The parties are notified that a failure to object to this
recommendation in accordance with the local rules of practice may
be held to be a waiver of any right to appeal the district
judge's adoption of this recommendation.

     IT IS FURTHER HEREBY ORDERED:  Trial is set for 9:00 a.m. on
December 19, 2005 for a duration of three trial days before the
Honorable Richard G. Kopf.  Jury selection will be at the
commencement of trial.

     DATED this 2nd day of November, 2005.


                         BY THE COURT:

                         s/ David L. Piester
                         David L. Piester
                         United States Magistrate Judge